**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-336 (JDB)** |
| **v.** | : | |
| | : | |
| **SAMUEL CHRISTOPHER MONTOYA,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Samuel Montoya to 45 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution.

**I.        Introduction**

Defendant Samuel Montoya, a 37-year-old video editor who, until recently, worked for *InfoWars*, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, sent to defendant on October 12, 2022, (ECF No. 54 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, the plea agreement acknowledges a sum of $2,734,783.14 in damage as of April 5, 2022 (ECF No. 55 at ¶ 10). As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Montoya pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in the U.S. Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case. Montoya spent an extensive amount of time inside the Capitol Building (approximately 38 minutes), creating a 44-minute video of his time at the Capitol for *InfoWars*. The video establishes that Montoya witnessed multiple acts of violence, encouraged the riot, and joined in the mob's breach of the police line in the Crypt (which he punctuated with "we're storming!"). Instead of demonstrating remorse, Montoya later attempted to capitalize on his participation in the riot in his unsuccessful political campaign for the House of Representatives, where his campaign website was "capitolsam.com."

The Court must also consider that Montoya's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Montoya's crime support a sentence of 45 days' incarceration.

## II.   Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

The government refers to the general summary of the attack on the U.S. Capitol in Montoya's Statement of Offense. *See* ECF No. 54 at ¶¶ 1-7.

### Defendant Montoya's Role in the January 6, 2021 Attack on the Capitol

On January 6, Montoya spent approximately 38 minutes traveling throughout the Capitol Building. From the Senate Wing Door, he progressed to the Crypt (where he was part of a mob that overran police), to the Rotunda, to the House Chamber Door (where he witnessed the crowd

trying to break in), to the Speaker's Lobby (where he saw a shooting). All along the way, he filmed.

Montoya edited his footage into a video, approximately 44 minutes long, which appeared under the heading "Patriots Storm Congress Raw Footage Includes Execution of Ashli Babbitt." It is embedded with the tag "THERESISTANCE.VIDEO." The video captures "Sam" going from the Capitol Grounds into the Capitol Building along with crowds of protesters on January 6, 2021.  Montoya's video, submitted as Exhibit 1, captures his movements outside and then inside the Capitol Building until he arrives by the doors outside the Speaker's Lobby, where it depicts the shooting of the woman publicly identified as Ashli Babbitt. At one point, Montoya turned the camera on himself and exclaimed, "It feels good to be in the Capitol baby!"  Ex. 1 at 14:30.  A screenshot of that moment is depicted below (with Montoya in the red circle):[2]



*Image 1*

Despite characterizing himself as a "reporter," from the beginning of his video, Montoya made clear that he was not an outside observer, but a participant: "that's what a march is. We're shoulder to shoulder, support for our president." Ex. 1 at 2:00.

And even before Montoya entered the Capitol, he saw numerous indicators that he and the other rioters were not permitted on Capitol grounds or inside the Capitol Building. At the outset of his video, he reported having heard from other rioters about "rubber bullets." *Id.* at 0:40-0:45.

---

[2] All images in this sentencing memorandum are stills from Montoya's video, Exhibit 1.

He acknowledged "there's some barricades up there." *Id.* at 2:30-2:38. Soon after, he remarked on the tear gas: "I heard a blast…I'm running toward that tear gas." *Id.* at 3:15-3:35. He continued, "Alright, I heard a couple of blasts of teargas, apparently. I don't smell anything yet, but. Excuse me. Alright, here we go. And now I smell it. Are you alright? Okay, they got teargas right there. Alright, there's so much teargas. There's so much teargas." *Id.* at 3:55-4:45. He was not dissuaded: "We are taking back the Capitol! Right now." *Id.* at 4:45-4:55. Around him, people yelled, "storm the Capitol!" and "now or never!" as he filmed rioters advancing through scaffolding, using bicycle racks to climb up the side of a staircase connecting the Lower West and Upper West Terraces, and walking up the staircase's banister. *Id.* at 4:55-5:15. Below is a still of the melee on the stairs leading to the Upper West Terrace that Montoya filmed and then joined:



*Image 2*

Seeing this, Montoya exclaimed, "people are ready to die for their country!" *Id.* at 5:30-5:40. Nevertheless, he said, "I'm still gonna try and get closer. My dumbass. Here we go." *Id.* at 6:00. At multiple points in the video, Montoya described feeling like it was "1776."

4

After initially claiming that he was at a "peaceful protest," (*Id.* at 0:50), Montoya soon gave up that claim: "this is a peaceful—well it doesn't seem very peaceful. But it is a protest." (*Id.* at 6:50-7:00). Less than five minutes later, his conclusion was clear: "this is not a peaceful protest. This is not a peaceful protest…" *Id.* at 11:45-11:55.

Montoya also acknowledged seeing people on the "roof" and "climbing the rafters" to "get into the Capitol Building" and "take their country back." *Id.* at 6:40-7:30. After admiring that people around him were ready for "freedom and liberty," (*Id.* at 8:10-8:17), Montoya joined them, acknowledging the lawlessness: "I'm not even taking stairs, folks. I'm climbing the rafters like everybody else. I don't know how all these people are getting in the Capitol. I don't know what's going on with the Capitol Police. Honestly, it's a madhouse. It's a fucking—it's a madhouse." *Id.* at 8:40-9:00. Immediately after, he saw police "shooting teargas." *Id.* at 9:00-9:32. He continued to climb the scaffolding-covered stairs. He soon remarked on hearing "bombs bursting outside" that he thought was more teargas. *Id.* at 13:45-13:53. At the top of the stairs, Montoya filmed police in "SWAT gear" guarding an emergency exit door near the Parliamentarian's Office. *Id.* at 12:20-12:25.

With the alarm sounding, Montoya entered the Capitol Building at approximately 2:18 p.m. through the Senate Wing Door, within about five minutes of the initial breach of that door, which was the first breach of the building. *Id.* at 12:51. Montoya yelled, "we are in the Capitol baaaby! Yeah!" *Id.* at 12:57-13:05. He joined chants of "Whose house?  Our house?" *Id.* 13:10-13:10.

He walked down a hallway toward the Crypt. As he approached, he said, "be respectful. We're better than Antifa." *Id.* at 14:05-14:15. Another unauthorized individual urged the crowd to "get in there, do your job, get out." Montoya agreed, "that's right." *Id.* at 14:12-14:19.

Montoya arrived in the Crypt as it began to fill with rioters. *Id.* at 14:30. A police line had formed as well – but the officers were greatly out-numbered and a tense standoff was underway. The Crypt of the Capitol is an important location: in the middle of the building, directly below the Rotunda. From the Crypt, individuals could – and, after the police line was breached, did – access areas such as a staircase leading upstairs to the Rotunda, Speaker Pelosi's Office Suite, and the pathways toward the House and Senate Chambers.

As he stood at the front lines, Montoya recognized the tense situation:

> These cops are probably really scared right now, y'all, and I don't blame them. I don't blame them for being scared. Everybody has had enough and we're all piling in here, right now. So I don't wanna see anybody get hurt, I don't wanna see anybody get hurt, that's the last thing I wanna see today. We're all being a little bit too rowdy, for sure.

*Id.* 15:25-15:46.



*Image 3*

By that point, the rioters did not need to assault officers to advance; given their superior numbers, they simply had to move forward. At about 2:25 p.m., that is what they did. Several officers recalled being pushed against the walls as the mob overran the police line; one remembered that he was pinned so tightly that he could not move his arms to secure his weapon and had difficulty breathing. Officers found themselves trapped and isolated within the crowd:

6



*Image 4*

*Id.* at 20:24.

Montoya had been close to the front of the crowd when it overran the police, and he advanced along with the other rioters, filming. The room filled with yells and cries.



*Image 5*

*Id.* at 19:48. As the surge began, Montoya said, "Alright, here we go. No, they're storming, they're storming. Oh, we're storming, we're storming. I'm being pushed, I'm being pushed." *Id.* at 19:45-19:51.

Rioters flooded the Crypt:



*Image 6*

Montoya declared, "it's officially a madhouse" (*id.* at 20:50-20:51)

From the Crypt, Montoya saw rioters break into an office (that he called "Stephen Hoyer's office") and then continued down a hallway past the House Wing Door. Another rioter told Montoya that he was approaching an exit. Instead of leaving, Montoya turned around and rejoined the fray – a hallway leading back toward the Crypt. *Id.* at 23:30-24:10.

He focused his camera on a statue of Vaclav Havel, on whose head a "Make America Great Again" hat had been placed:



*Image 7*

*Id.* at 26:33. He climbed a spiral staircase as rioters around him called out for "Nancy," again commenting, "there's so much gas." *Id.* at 27:45-27:51. After briefly passing through the entrance to Nancy Pelosi's suite, he turned around and walked into the Rotunda, where he remained for a few minutes. He helped a rioter who had been pepper sprayed walk to a bathroom, telling him along the way, "you did it, buddy! We're gonna take our country back." *Id.* at 33:00-33:30. The individual asked Montoya a question about the police, and Montoya answered, "What's that? The cops—uh, they didn't stand down. Well, I guess they stood down if you wanna say that." *Id.* at 33:30-33:40.

Montoya next arrived in the Statuary Hall Connector, where a group of rioters had recently pushed back a police line and advanced to the door of the House Chamber. The mob yelled, "break it down!" *Id.* at 35:45. Montoya noted, "There's senators being emergency evacuated right now" (*id.* 35:55-36:00):



*Image 8*

Montoya next ran down the hallway, where he filmed rioters trying to break down doors. He turned into the Speaker's Lobby. He commented, "Looks like that patriot's trying to break the glass in the speaker's lobby." *Id.* at 37:20-37:26.

Indeed, in front of Montoya, a rioter was punching through the glass. Montoya moved closer, and saw police in riot gear coming up the stairs. *Id.* at 38:31. He said to the police, "Be safe

guys, we're trying to be peaceful! Be safe. Be safe guys. Peace! Peace! Peace!" *Id.* at 38:40-38:45. By then, the rioter was using a helmet to continue to smash the windows as another rioter yelled, "break it down!" (*id.* at 38:50):



*Image 9*

Montoya observed that, as the rioter continued to violently break the windows, officers who had been stationed near the doors began to file away. *Id.* at 38:50-39:00. Once the windows were broken, some officers filed away from the area. Seconds later, another member of the crowd (Ashli Babbitt) tried to climb through one of the broken windows and was shot. Montoya filmed as she fell back. *Id.* at 39:09-39:15. Less than ten minutes later, at approximately 2:58 p.m., police officers ushered Montoya and others out of the East Front House Door.

During his video, Montoya also made the following statements:

- 9:55 – "We're gonna crawl, we're gonna climb. We're gonna do whatever it takes, we're gonna do whatever it takes to MAGA. Here we go, y'all. Here we go, y'all. Look at this, look at this. I don't even know what's going on right now. I don't wanna get shot, I'll be honest, but I don't wanna lose my country. And that's more important to me than—than getting shot."

- 11:04 – "We have had enough!  We're not gonna take your fucking vaccines! We're not gonna take all your bullshit! The people are rising up! Folks, I am now on the steps of the Capitol. Here we go! Here we go! Having a good time!"

- 16:07 – "Here we are in the US Capitol in Washington D.C. in the Capitol building, it has officially been stormed by Trump supporters. Again, the U.S. Capitol building in Washington D.C. has officially been stormed by Trump supporters. And here we are, taking our—the people's house back!"

- 17:38 – "I'm sure these officers are scared, but we're here, we're here to just show that we've had enough. We've had enough."

- 34:05 – "We don't hurt innocent people; we don't tear down statues! We don't tear down statues! We take our house back! We take the people's house back!"

*Public Communications By and About Montoya After January 6*

On January 8, 2021, talk-show host Owen Shroyer, who is also associated with the Infowars website,[3] interviewed Montoya for Shroyer's online *War Room with Owen Shroyer* show. Montoya described to Shroyer hearing the gunshot inside the Capitol and his recollections of the scene of Ashli Babbitt's shooting. The same day, Montoya privately shared a video of his footage from inside the Capitol over text and told a contact that "the Constitution" was his contact's press credential.[4]   Montoya appeared on *War Room with Owen Shroyer* again on January 11, 2021, where he claimed that small teams of Antifa agitators were responsible for the violence, and had arranged for fellow Antifa members to be nearby and film them.

In an episode of the *Alex Jones Show* broadcast on April 14, 2021, Alex Jones, the owner of  InfoWars, discussed Montoya's presence at the Capitol.  *See* https://banned.video/watch?id=607778616dd57723d5eab87a.  Jones denied sending Montoya to Washington, D.C., on InfoWars' behalf, claiming that he had told Montoya to stay behind (in

---

[3] Shroyer was within the restricted perimeter of the U.S. Capitol on January 6 and has also been charged. Complaint, *United States v. Shroyer,* ECF No. 1, 21-cr-542 (TJK) (D.D.C. filed Aug. 19, 2021).

[4] Montoya did not have a press credential permitting him to enter the Capitol. He had a "Women for America First Press Pass" purporting to authorize entry to the March for America on January 6, 2021, which would have allowed him access to a press riser at the Ellipse – not entry onto Capitol Grounds or into the Capitol Building.

Texas) to work on the InfoWars broadcasts while Jones and others were in Washington, D.C. Jones said that Montoya went to D.C. on his own, and that Jones had instructed his staff not to go inside the U.S. Capitol.[5]

At some point, Montoya launched a congressional campaign in the 35th district of Texas for the 2022 election cycle. Montoya's campaign website address was "capitolsam.com," a reference to the U.S. Capitol. The website included a section entitled "Arrest and Political Persecution." In an online television appearance, Montoya claimed that he was running because of his experience being "targeted and persecuted" for his conduct on January 6. *The David Knight Show* 2/28/2022, at 2:11:20-2:11:33, available at https://rokfin.com/stream/15135/The-David-Knight-Show--02282022?fbclid=IwAR0rlS1S-kI30b-3sXLSRCxd68Avt26EWKXCM1IHPx_3ZI2vkoW3p7I-8oY. In the appearance, Montoya claimed he was being targeted for being a cameraman doing his job. *Id.* at 2:15:00-2:16:00. Montoya said he was "fighting for the rights of all journalists." *Id.* at 2:18:20-2:18:50. In the same interview, though, discussing January 6, Montoya said that "we were there to protest what we saw as election, uh, inaccuracies." *Id.* at 2:29:00-2:29:15. Montoya was unsuccessful in the primary election on March 1, 2022.

*The Charges and Plea Agreement*

On April 13, 2021, Montoya was arrested and charged with five misdemeanors in connection with his role in the breach of the U.S. Capitol: (1) Entering or Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Violent Entry and

---

[5] Jones also claimed that Montoya was "waved in" by U.S. Capitol Police, even though there were no Capitol Police stationed outside the Senate Wing Door when Montoya breached it, and Montoya never claimed he was waved into the Capitol Building in his video.

Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); (4) Impeding Passage Through the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104€(2)€; and (5) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).. ECF No. 9. On April 30, 2021, the government filed a five-count information charging Montoya with the same five misdemeanors named in the complaint. ECF No. 13. The government later filed a superseding information charging Montoya with the same five misdemeanors. ECF No. 43. Montoya met with the government for a proffer on November 30, 2021. He later signed a certificate of authenticity for his video.

On November 7, 2022, pursuant to a plea agreement, Montoya pled guilty to Count 5 of the Superseding Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF No. 55. In the plea agreement, Montoya agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Montoya now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Montoya faces up to six months of imprisonment and a fine of up to $5,000. Montoya must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of the recommended sentence of 45 days' incarceration and 36 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at \*5 (D.D.C. Dec. 28, 2021). While assessing Montoya's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Montoya, the absence of violent or destructive acts is not a mitigating factor. Had Montoya engaged in such conduct, he would have faced additional criminal charges.

Various aggravating factors are present Montoya's case. First, Montoya spent nearly 40 minutes inside the Capitol Building, in addition to the several minutes he spent climbing up to the Northwest Courtyard from the West Side. Second, Montoya was part of the mob that overran the police line in the Crypt. While Montoya himself did not instigate the confrontation, the mob relied on its superior numbers to move forward and engulf the police officers, some of whom, in a terrifying moment, found themselves isolated in the crowd or trapped against the walls. Third, Montoya saw many clear indicators that he was not permitted to be in the Capitol – and he ignored them all. As Montoya approached the building, he saw people turning bike racks into ladders to climb up a staircase leading to the Upper West Terrace; other people climbed on the banister. Montoya saw, heard, and smelled the police using teargas to repel the rioters, and commented on it repeatedly. Once he entered the Capitol, alarms blared and no one went through security.

Blatantly disruptive conduct was all around him, from a baseball cap placed on a statue, to rioters trying to break down doors, to another rioter using a helmet to punch through a window. He saw more police in riot gear arriving at the Speaker's Lobby moments before Ashli Babbitt was shot, and asked them to stand down.  At multiple points, Montoya recognized the potential for violence and injury and remained in the Capitol nonetheless.  Even after Babbitt was shot, he still did not leave until police pushed him out the door.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B.  Montoya's History and Characteristics

Montoya has a scattering of alcohol and marijuana-related arrests and convictions, all of which are more than ten years old, and none of which would have resulted in any criminal history points, were the sentencing guidelines to apply here.

Another aggravating factor in Montoya's case is his refusal to accept responsibility for his actions. The PSR notes that he had worked for the InfoWars website as a video editor until November 2022, when the company declared bankruptcy. PSR ¶ 51. Accordingly, on January 6, Montoya was employed by InfoWars, and Montoya has claimed that he was simply acting as a "reporter" that day. However, Alex Jones, the owner of InfoWars, denies that he sent Montoya to D.C., let alone into the Capitol, on January 6, 2021. Also, as detailed above, Montoya engaged in behavior that day that confirmed that he was not acting as a reporter, but as part of the mob of rioters, joining in the mob's breach of the police line in the Crypt and chanting with the crowd. He also admitted in his video that he was protesting and rioting with the crowd, including noting that "We're shoulder to shoulder, support for our president" and "We're storming!" Even his guilty plea acknowledges that Montoya was not a mere observer of the events that day. He was a

participant. However, for over a year, Montoya insisted that he was being persecuted for being a reporter doing his job, despite his own video showing that he was a participant. Not only did Montoya refuse to accept responsibility, he displayed pride in his actions on January 6 and sought to use them for political gain, branding his congressional website "capitolsam.com." While the government appreciates the defendant's choice to express his political interests through the democratic process, the idea that storming the Capitol is a selling point, something to be celebrated, indicates a lack of remorse and acceptance of responsibility

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted above, for over a year, Montoya insisted that he was being persecuted for being a reporter doing his job, despite his own video showing that he was a participant. Not only did Montoya refuse to accept responsibility, he displayed pride in his actions on January 6, labeling his video at the Capitol "*Patriots Storm Congress* Raw Footage Includes Execution of Ashli

Babbitt" (emphasis added).  He also sought to use his criminal conduct for political gain, branding his congressional website "capitolsam.com."  Montoya still refuses to fully acknowledge the wrongfulness of his conduct and so there is a greater risk he will offend again without a sentence serious enough to deter him from such behavior.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

The government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from misdemeanors, such as in this case, to assaults on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Montoya based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. *See also United States v. Fee*, 21-cr-133 (JDB), Apr. 1, 2022 Tr. at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.").

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection"; it is only one of several factors to consider. 18 U.S.C. § 3553(a). Although unwarranted disparities may "result

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do.

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may

have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 (observing that "judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on

the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson).

Although the other defendants discussed below also participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. Two appropriate comparators are other defendants who filmed and broadcast extensively inside the Capitol (or claimed that was their purpose), Anthime Gionet and Jesus Rivera. Like Montoya, Gionet (also known as "Baked Alaska") remained in the Capitol for a relatively longer period of time (over an hour) and filmed a 27-minute livestream video. Gov. Sentencing Mem., *United States v. Gionet,* 22-cr-132 (TNM), ECF No. 69, at 3 (D.D.C. filed Nov. 15, 2022). Montoya's rhetoric was milder than Gionet's, who yelled profanities at police, but Montoya made multiple comments evincing an intent to "take" the Capitol, setting aside the obvious concern of the police: "I'm sure these officers are scared, but we're here, we're here to just show that we've had enough. We've had enough." Gionet, unlike Montoya, had more recent, relevant criminal history, having been convicted of assault, disorderly conduct, criminal trespass for a 2020 incident, and criminal damage in a separate 2020 incident. Judge McFadden sentenced Gionet to 60 days' incarceration.

The Court may also wish to consider the eight-month sentence imposed in *United States v. Rivera,* 21-cr-60 (CKK), including a six-month sentence for the violation of 40 U.S.C. §. 5104(e)(2)(G). Like Montoya, Rivera claimed he entered the Capitol to film events; he spent about 20 minutes inside the Capitol and live-streamed. Gov. Sentencing Mem., *United States v. Rivera,*

21-cr-60 (CKK), ECF No. 69 (D.D.C. filed Oct. 17, 2022). While Rivera went to trial, and Montoya pleaded guilty, neither defendant displayed remorse.

Montoya's case is more aggravated than that of Jonas Buxton, whom the Court recently sentenced to probation. *United States v. Buxton,* 21-cr-739 (JDB). Buxton entered through the Senate Wing Door at 3:05 p.m., well after it had been breached. Gov. Sent. Mem, *United States v. Buxton,* 21-cr-739 (JDB), ECF No. 33 at 6 (D.D.C. filed Nov. 22, 2022). He continued to the Crypt, also arriving there well after the breach of the police line. Unlike Montoya, who breached the police line in the Crypt with the crowd and then continued to roam through the Capitol, Buxton turned around and left, having spent about 16 minutes in total inside the building. *Id.* at 7. Buxton was also 25 years old, and did not publicize and attempt to capitalize on his participation in the riot as Montoya did. *Id.* at 1.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[7]

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Montoya to 45 days' incarceration,

---

[7] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

36 months' probation, $500 restitution, and 60 hours' community service. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Alexis Loeb*
         Assistant United States Attorney (Detailed)
         U.S. Attorney's Office
         450 Golden Gate Ave., 11th Floor
         San Francisco, CA 94102
         Office: (415) 436-7168
         Alexis.Loeb@usdoj.gov